## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| D.H., a minor, by his parents and next friends,<br>Kathy and Mark Higgins,<br>8216 Chancery Ct.,<br>Alexandria, VA 22308,<br><br>and<br><br>KATHY AND MARK HIGGINS,<br>8216 Chancery Ct.,<br>Alexandria, VA 22308,<br><br>        Plaintiffs,<br><br>        v.<br><br>FAIRFAX COUNTY SCHOOL BOARD,<br>8115 Gatehouse Road<br>Falls Church, VA 22042,<br><br>        Defendants. | Civil Action No. 19-1342 |

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**[1]

**Preliminary Statement**

1. D.H. is an eleven-year-old boy who resides in Fairfax County, Virginia with his parents, Kathy and Mark Higgins ("the parents"). The parents bring this action because Fairfax County Public Schools ("FCPS"), failed to provide D.H. with the Free Appropriate Public Education ("FAPE"), to which he is entitled under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§1400 *et seq.* Of equal importance, when the parents

---

[1] The amended complaint is being filed to correct the name of the defendant, as well as defendants' address in the case caption. The amended complaint also includes a full description of the parties in this case and corrects some errors in the numbering of paragraphs.

contested the FCPS proposal of services, the Hearing Officer considering their appeal plainly erred in concluding that the parents were not entitled to tuition reimbursement for the 2018-19 school year or placement and funding for the 2019-20 school year.

## Jurisdiction

2. This Court has jurisdiction pursuant to the IDEA, 20 U.S.C. §§ 1400-1461; the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; 42 U.S.C. § 1983 ("Section 1983"); and 28 U.S.C. §§ 1331 and 1343. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. This Court has pendent jurisdiction pursuant to VA. CODE ANN. § 22.1-213 *et seq.*, (2003). Plaintiffs have exhausted their administrative remedies and appeal to this Court from a Decision of a Hearing Officer of the Virginia Department of Education, Division of Compliance, dated July 30, 2019.

## Parties

3. D.H. is a disabled student eligible to receive special education and related services, who at all times relevant to this action resided in Fairfax County, Virginia. His parents, bring this action on D.H.'s behalf and in their own right.

4. The Fairfax County School Board is a local educational agency as defined by 20 U.S.C. § 1401, and as such, receives financial assistance from the United States Department of Education. The Fairfax School Board operates Fairfax County Public Schools and is responsible for complying with federal law with respect to the provision of a FAPE to each disabled child in Fairfax County.

## Factual Allegations

5. D.H. has been found eligible by FCPS as a student with educational disabilities

who qualifies for specialized instruction and related services under the IDEA.

6. D.H. was born at forty weeks gestation via natural delivery after an uncomplicated pregnancy.

7. After suffering from frequent ear infections, D.H. had his adenoids removed in 2011, his tonsils removed in 2012, and pressure equalization tubes were placed in 2012. D.H. met his early language and motor milestones on schedule.

8. D.H. attended the Joann Blanks Child Development Center for pre-Kindergarten from ages two to four.

9. D.H. attended Stratford Landing Elementary ("Stratford"), for Kindergarten through fourth grade.

10. D.H. currently attends Oakwood School ("Oakwood"), having been placed there by his parents in 2018 for fifth grade.

11. From March to September 2013, D.H.'s parents placed him in play therapy through the Child and Family Counseling Group due to concerns about his behaviors that reflected anxiety.

12. Beginning in 2013, D.H.'s parents also provided him with private Occupational Therapy ("OT"), sessions once a week at Skills on the Hill ("Skills").

13. On June 10, 2013, Jane Rutt, an Occupational Therapist at Skills, completed an evaluation. Ms. Rutt emphasized that D.H.'s impulsivity, distractibility, and poor behavior greatly impacted his performance on the evaluation.

14. Ms. Rutt found that D.H. had difficulty with bilateral coordination, inefficient pencil grasp and endurance, and sensory processing challenges that impacted his learning.

15.     Ms. Rutt was also in contact with D.H.'s teachers in FCPS, including observing at school and discussing strategies to help D.H. succeed in school.

16.     D.H. received private OT services at Skills from June 2013 through August 2015, before transitioning to a group focusing on gross motor and social skills at Skills from September 2015 through August 2017.

17.     On July 12, 2013, D.H. was referred to the FCPS Local Screening Committee, due to his parents' concerns over his sensory needs and the OT evaluation completed by Ms. Rutt.

18.     FCPS decided not to further evaluate D.H. for special education services on July 25, 2013, because it concluded his skills fell within age expectations in the areas of fine and gross motor skills.

19.     On September 17, 2013, D.H. was in Kindergarten at Stratford.  He was observed by Erin Moreno, an FCPS Occupational Therapist, per his parents' request.  Ms. Moreno noted that D.H. required cueing during transitions, encouragement and extra time from his teacher, was distracted, and removed himself from the learning environment by going under a table, lying on the floor, or kneeling with his face to the carpet.

20.     In November 2013, D.H.'s parents sought an independent evaluation from Christina Hyon-Wynn, a licensed clinical psychologist at Child and Family Associates.

21.     Dr. Hyon-Wynn conducted two clinical interviews, a records review, a classroom observation, and the Behavior Assessment System for Children, Second Edition ("BASC-II"). She concluded that D.H. met the criteria for Attention-Deficit/Hyperactivity Disorder, Combined Type ("ADHD").

22.     D.H. was brought before the FCPS Eligibility Committee a second time on April

2, 2014 due to his parents' continuing concerns about his social skills and attention, as well as concerns raised by his teacher, Ms. McDade, concerning attention, concentration, behavior regulation, and social adjustment.

23. The parents gave their consent for evaluations on April 10, 2014 at a Committee meeting; FCPS completed D.H.'s initial evaluations in April, May, and June 2014.

24. On May 2, 2014, Stephanie Lutz, an FCPS school counselor, conducted a classroom observation.

25. Ms. Lutz observed that D.H. had to be redirected by, and looked for reassurance from, his teacher very often during her observation.

26. On May 6, 2014, Amanda DePaolis, an FCPS special education teacher, conducted an Educational Evaluation.

27. Ms. DePaolis completed a classroom observation and the Kaufman Test of Educational Achievement, 2nd Edition. D.H. tested in the average range across reading, phonological awareness, math, written expression, and oral fluency.

28. In May and June 2014, Caroline Connors, an FCPS school psychologist, conducted a psychological examination to gather information about D.H.'s cognitive and social/ emotional functioning.

29. Ms. Connors identified significant attention-related symptoms, difficulty with behavior and emotional regulation, sensory sensitivities, and inflexibility. D.H.'s cognitive abilities ranged from the average to the superior, but his social/emotional functioning reflected elevated activity levels, aggressive behaviors, and difficulty recovering after setbacks.

30. The FCPS Eligibility Committee convened on June 10, 2014 to review the

evaluations and discuss D.H.'s eligibility for special education services.

31. D.H. was found eligible as a student with an Other Health Impairment ("OHI").

32. FCPS developed D.H.'s initial Individual Education Program ("IEP") on June 24 and July 23, 2014, which placed him in the Autism program and provided sixteen-hours-and-forty-five minutes per week of specialized instruction in the general education setting, one hour per week of specialized instruction outside the general education setting, and thirty minutes per week of counseling to address behavioral concerns.

33. Through the IEP process, the parents requested, and the team agreed to conduct, an OT evaluation to assess D.H.'s OT needs.

34. On September 15, 2014, when D.H. was in first grade at Stratford, the FCPS IEP team amended D.H.'s IEP without a meeting to request an adapted physical education evaluation.

35. On October 1, 2014, the FCPS IEP team amended D.H.'s IEP without a meeting to update his present levels of performance.

36. On October 2, 2014, Adam Rubinstein, an FCPS adapted physical education teacher, conducted an observation of D.H. and drafted an Adapted Physical Education Report.

37. Mr. Rubinstein concluded that D.H. was able to access physical education class with his peers.

38. On October 6, 2014, D.H.'s parents signed the Notice and Consent for Evaluation by the FCPS Occupational Therapist.

39. On October 8, 2014, Leanne Bryan, an FCPS Occupational Therapist, conducted an OT Evaluation of D.H.'s needs.

40. Ms. Bryan conducted a classroom observation and used the Developmental Test

of Visual Perception to evaluate D.H.  She concluded that D.H. was able to participate in his "occupational roles" as a student.  Ms. Bryan also concluded that although he displayed a variety of off-task behaviors, D.H. responded to redirection.

41. On October 29, 2014, Jennifer Grimley, an FCPS speech-language pathologist, conducted a Speech and Language Services Screening/Consultation Report to evaluate D.H.'s needs.

42. Ms. Grimley noted that she was available to consult with D.H.'s teachers if they needed help with IEP goal planning, but did not recommend any services.

43. FCPS convened an IEP meeting on November 21, 2014 to review D.H.'s IEP goal progress and FCPS evaluations.

44. The proposed IEP provided fifteen hours and forty-five minutes per week of specialized instruction inside general education, and one hour per week of specialized instruction outside general education.  The IEP also provided for thirty minutes per week of counseling services.

45. D.H.'s parents objected to the narrow scope of the FCPS OT evaluation, and requested both an independent OT evaluation and OT services in the school setting.

46. On December 18, 2014, FCPS convened an IEP meeting to amend D.H.'s IEP. The IEP provided fifteen-hours-and-forty-five minutes per week of specialized instruction inside the general education setting, one hour per week of specialized instruction outside the general education setting, and thirty minutes per week of counseling services.

47. The parents disagreed with the scope of the OT evaluation, failing to identify D.H.'s needs, and gave notice that they would seek an independent OT evaluation.

48. In December 2014 and January 2015, Dr. David Black, a neuropsychologist, conducted an independent Neuropsychological Evaluation of D.H.

49. Dr. Black diagnosed D.H. with ADHD, highlighting his executive functioning weaknesses, an anxiety disorder, and poor self-regulation.

50. Dr. Black identified D.H. as a "twice exceptional" young man because he is both intellectually gifted and has significant challenges that interfere with his learning.

51. Dr. Black suggested IEP goals to address D.H.'s reading, writing, and executive functioning weaknesses.

52. Dr. Black also recommended a classroom setting that is highly structured with a low student-to-teacher ratio, and with a flexible instructor.

53. On June 15, 2015, FCPS held an IEP meeting to review D.H.'s present levels of performance and the independent evaluation from Dr. Black, as well as to address concerns of teasing from fellow students.

54. On August 4, 2015, FCPS held an IEP meeting to updated D.H.'s IEP and discuss supports and services.

55. The August 2015 IEP provided fifteen hours per week of specialized instruction inside the general education setting, one hour per week of specialized instruction outside the general education setting, and thirty minutes per month of counseling services. The parents' request for one hour of OT services and a speech and language evaluation were denied. On October 29, 2015, FCPS confirmed that D.H. did not require individual speech and language services.

56. In the fall of 2015, after beginning second grade at Stratford, D.H. began attending

weekly individual therapy with Dr. Black, before eventually moving to a twice-a-month schedule. Despite making progress with Dr. Black, he continued to require the support of these therapeutic sessions throughout his time in FCPS.

57. On May 10, 2016, the FCPS IEP team met for its annual review of D.H.'s IEP, to update his present levels of performance, and to discuss the school's proposed goals.

58. The IEP provided fourteen hours per week of specialized instruction inside the general education setting, two hours per week of specialized instruction outside the general education setting, and thirty minutes per month of counseling services.

59. On September 2, 2016, at the start of D.H.'s third grade year at Stratford, the parents obtained a follow-up evaluation from Dr. Black due to concerns with D.H.'s failure to make progress.

60. Dr. Black, along with Dr. Patricia Ulanet, authored a Neurocognitive Educational Summary to assist the parents in identifying an educational environment that would help D.H. to progress.

61. The Neurocognitive Educational Summary indicated that D.H. has strengths in his high intelligence, emotional sensitivity, earnest work ethic, and his math and oral reading skills. It also confirmed weaknesses in attention, cognitive processing deficits, rigid work style, difficulty with language-based organization and verbal retrieval, spelling, and timed math fluency.

62. Drs. Black and Ulanet identified goals and strategies to help D.H. access his potential and overcome his weaknesses, that included a classroom with a small teacher-student ratio, a challenging curriculum, a flexible classroom environment, written instructions, extra

time, and using real-life examples to facilitate understanding of cause and effect.

63. On October 18, 2016, FCPS amended D.H.'s IEP to increase his service hours outside of general education, discuss current progress, and add a reading goal.

64. The resulting IEP provided ten hours per week of specialized instruction inside general education and six hours per week of specialized education outside of general education. The IEP also provided thirty minutes of counseling per month.

65. On May 12, 2017, FCPS convened an IEP meeting in advance of D.H.'s re-eligibility determination. The team reviewed the parents' independent neurocognitive development evaluation and discussed D.H.'s present levels of performance.

66. On June 9, 2017, FCPS convened another IEP meeting to review D.H.'s eligibility to receive special education services. The IEP team went over the criteria for an OHI in the context of the evaluations on file, along with student work product and teacher evaluations.

67. The team found that D.H. remained eligible for special education services as a student with an OHI.

68. D.H. attended fourth grade at Stratford Landing during the 2017-18 school year.

69. D.H. did not pass his reading Standards of Learning ("SOL") for the fourth grade and his score was not even close enough to qualify him for a retest. The reading SOL is the test developed and administered by the State to determine if children are meeting expectations in particular academic areas.

70. In November 2018, D.H.'s special education teacher reported to the parents that he was being instructed below grade level in language arts.

71. According to his Developmental Reading Assessment ("DRA"), D.H. was reading

at a beginning third grade level at the start of fourth grade.

72. In early 2018, D.H.'s parents began searching for an alternative educational setting for D.H. due to his lack of progress within FCPS.

73. D.H.'s parents also pursued an independent educational evaluation from Dr. Laura Solomon due to significant concerns about the specialized instruction their son had been receiving and continuing instances of bullying in FCPS.

74. The parents requested that Dr. Solomon review and revise D.H.'s IEP, and assist them in obtaining appropriate programming, services, and placement.

75. Dr. Solomon conducted a Diagnostic Educational Evaluation on April 2, 2018 to identify D.H.'s academic achievement levels. He scored mostly in the average range on the Woodcook-Johnson IV ("WJ-IV") subtests.

76. Dr. Solomon noted that D.H.'s greatest area of need in reading is in Comprehension.

77. In Math, Dr. Solomon found D.H.'s performance greatly impacted by his extremely slow processing and output.

78. Dr. Solomon concluded that D.H.'s difficulties in written language and spelling were consistent with a diagnosis of dyslexia.

79. Dr. Solomon used two behavior rating scales to help inform her that D.H. functions much better when he is provided with specialized instruction in a smaller setting, and that he is unable to learn appropriately in a large, general education setting.

80. Dr. Solomon administered the BRIEF to look at D.H.'s executive functioning skills. The response provided by D.H.'s fourth grade teacher, Mr. Hess, yielded clinically

significant scores for inhibit, self-monitor, emotional control, and emotional regulations. He also confirmed elevated scores in organization, working memory, and planning.

81. Although Dr. Solomon did not conduct intellectual functioning testing during her evaluation, she did review his previously reported scores and noted that he fell in the Very Superior and/or Above Average ranges.

82. Dr. Solomon concluded that when D.H.'s academic performance is contrasted with his high intelligence, the mostly average academic scores fall far below expectations, and that he has not been learning consistent with his potential for a number of years.

83. Dr. Solomon also conducted a Classroom Observation on April 12, 2018 during D.H.'s reading class outside of general education. There were eight students, one teacher, and one aide. Dr. Solomon observed no individualization in the lesson for any of the eight students.

84. Dr. Solomon concluded that D.H. requires a highly specialized school placement for bright students with learning disabilities, attention needs, and executive functioning disorders.

85. D.H.'s parents gave FCPS permission to conduct an updated psychological evaluation on April 17, 2018. Sarah Apgar Painter, an FCPS school psychologist, conducted that psychoeducational evaluation on May 2, 4, and 9, 2018, reporting her findings on May 10th.

86. D.H.'s full-scale IQ scores on the Wechsler Intelligence Scale for Children, Fifth Edition ("WISC-V"), fell within the average range and his non-verbal index fell within the high average range.

87. Ms. Painter noted that during auditory processing subtests and the Comprehensive Test of Phonological Processing, Second Edition ("CTOPP-2"), D.H. was in constant movement, became easily distracted, and had difficulty following multi-step directions.

88. As with previous evaluations, D.H.'s weaknesses in his social, emotional, and behavior functioning were highlighted as an area of concern. Mr. Hess, his teacher, again endorsed clinically significant scores in conduct problems, anxiety, depression, somatization, atypicality, withdrawal, adaptability, and functional communication.

89. D.H. was given The Multidimensional Anxiety Scale for Children, Self-Report in which he rated his own feelings of anxiety. On the self-report, D.H. rated himself overall as very elevated. This included very elevated results for Social Anxiety, including humiliations/rejection and performance fears, Obsessions and Compulsions, and the physical symptoms of Tense/Restless.

90. Ms. Painter made recommendations for an educational setting that is more flexible and provides him strategies to manage his stress and distractibility.

91. On May 22, 2018, D.H.'s mother gave consent for FCPS to conduct Occupational Therapy and speech and language evaluations of D.H.

92. On May 24, 29, and 30, 2018, Jennifer Grimley, an FCPS speech-language pathologist, evaluated D.H. Ms. Grimley concluded that D.H.'s speech and language skills are appropriate for his age based on the Clinical Evaluation of Language Fundamentals, Fifth Edition. She found that D.H.'s scores should not impact him negatively in the general education setting.

93. On May 29 and June 1, 2018, Patti Turner, an FCPS Occupational Therapist evaluated D.H. Ms. Turner concluded that D.H.'s handwriting is consistently legible and that he presents with the skills necessary to access the general education curriculum.

94. On May 31, 2018, D.H.'s parents had him evaluated by the Virginia Vision

Therapy Center due to suspected visual problems related to his school work. The Developmental Vision Assessment was completed by Amy E. Carlyle who recommended optometic vision therapy once per week for forty-five minutes for approximately thirty-six sessions.

95. FCPS convened IEP meetings on May 15, June 11, and July 6, 2018 to review the evaluations, discuss IEP goal progress, newly proposed goals, and service hours.

96. The school system proposed a total of twelve-hours-and-thirty minutes per week of specialized instruction inside general education and ten hours per week of specialized instruction outside of general education.

97. FCPS continued to propose Stratford Landing as D.H.'s educational placement.

98. The parents disagreed with the proposed program and placement, and so notified FCPS.

99. D.H. failed to achieve the great majority of his IEP goals during the 2017-18 school year.

100. D.H. achieved only two IEP goals during his entire time at Stratford Landing, a period of five years.

101. The IEP goals that D.H. mastered were both academic in nature, meaning that during his time at Stratford Landing, D.H. mastered no goals in the areas of attention, executive functioning, or social/emotional.

102. On August 3, 2018, D.H.'s parents notified FCPS that they were withdrawing him from school and unilaterally placing him at Oakwood for the coming year.

103. FCPS convened an IEP meeting on August 13 and 20, 2018 to review D.H.'s present levels, and proposed specialized instruction hours and accommodations. Representatives

from Oakwood joined the meeting by phone.

104.     The IEP team proposed twelve-hours-and-thirty minutes per week of specialized instruction inside general education and ten hours per week of specialized instruction outside of general education.  The IEP did not propose any related services.

105.     D.H. began the 2018-19 school year, his fifth grade year, at Oakwood.

106.     On September 5, 2018, Oakwood administered the Clinical Evaluation of Language Fundamentals, Fourth Edition, for a better understanding of D.H.'s speech and language functioning.

107.     Oakwood noted that, while D.H. had passed all areas of the screening, he only did so by one point, so speech/language staff would continue to observe him in class and monitor his progress with his teachers.

108.     On September 6, 2018, Oakwood conducted an OT screening and concluded that D.H. would benefit from a consultation with a developmental optometrist.  The screening identified that D.H. struggles with his pencil grip, eye-hand coordination, letter/number reversals, organization, and his ability to focus.

109.     D.H.'s parents reached out to Stratford Landing and requested to observe the proposed placement, specifically how the IEP would be implemented there.

110.     Citing confidentiality, FCPS only permitted the parents and Dr. Solomon to observe the general education classroom, which they did on November 7, 2018 for approximately thirty minutes.  There were twenty students and one teacher in the classroom during the observation.

111.     Dr. Solomon concluded the program was inappropriate due to D.H.'s lack of

executive functioning skills, his learning disabilities, struggles with attention, and his prior difficulty in the general education classroom.

112. Since attending Oakwood, D.H. has made significant educational and social/emotional progress previously unavailable to him in FCPS.

113. Dr. Black determined that, due to his progress at Oakwood, D.H. no longer requires regularly-scheduled individual therapy sessions, but instead has recommended that he be seen on an "as-needed" basis.

114. On March 1, 2019, the parents filed a due process hearing request, appealing the proposal of FCPS, and seeking funding and placement for D.H. at Oakwood School.

115. The due process hearing was held on June 6, 7, 24, 25 and 26, and July 1, 2019.

116. The parents presented evidence and testimony from Dr. David Black, Neuropsychologist and mental health provider to D.H.; Dr. Laura Solomon, the family's educational consultant; Susan Autry, program supervisor for Oakwood School; and D.H.'s mother. All witnesses, with the exception of D.H.'s mother, were accepted as experts in their field.

117. FCPS presented Dustin Hess, D.H.'s former general education teacher; Patricia Turner, FCPS Occupational Therapist; Shirley Shannon, Assistant Principal at Stratford Landing; Jennifer Grimley, FCPS Speech and Language Pathologist; Sarah Painter, FCPS School Psychologist; Kelly Brady, FCPS Educational Specialist; Angela Prestipino, FCPS Program Manager; and Agnes Kwofi, D.H.'s former special education teacher.

118. The parents offered significant evidence to show that the proposed IEP and

placement at Stratford Landing could not meet D.H.'s unique needs.

119. The parents offered significant evidence to show that D.H. failed to make reasonable progress during his time at Stratford Landing, especially during his fourth grade year.

120. The parents offered significant evidence as to the benefit D.H. is receiving at Oakwood and the progress he has made, both academic and social/emotional in nature, through the supports provided at Oakwood.

121. The Hearing Officer issued his Decision on July 30, 2019.

122. The Hearing Officer ignored expert testimony from the parents' witnesses as well as evidence presented by the parents and the school system as to D.H.'s needs and lack of progress during his time at Stratford Landing.

123. The Hearing Officer's Decision contains palpable errors of fact and law.

124. The Hearing Officer did not engage in regular fact finding.

125. The plaintiffs are aggrieved by the Decision of the Hearing Officer.

126. The plaintiffs have exhausted their administrative remedies.

## COUNT I

127. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 126 above.

128. Federal and Virginia law require that a school system provide a student with a FAPE, and that a system that fails to provide a student with a FAPE must place and fund that student in a private placement that can provide that student with educational benefit.

129. FCPS failed to offer D.H. a FAPE for the 2018-19 school year.

130. The Hearing Officer committed error, and violated plaintiffs' rights under the

IDEA and Virginia law, by failing to order FCPS to provide reimbursement and prospective placement for D.H.'s placement at Oakwood.

## COUNT II

131. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 130 above.

132. The IDEA and Virginia Rules require the Hearing Officer to issue a decision that includes findings of fact relevant and determinative of the case and an explanation of the basis for the decision for each determinative issue.

133. The Hearing Officer here failed to make findings of fact, failed to acknowledge and discuss expert witness testimony, and failed to provide substantive analysis to explain how he reached his decision.

134. The Hearing Officer committed error and violated this family's rights by denying the requested relief without properly weighing the evidence before him and providing a reasoned explanation of his analysis of that evidence.

## COUNT III

135. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 134 above.

136. The Hearing Officer committed error, and violated plaintiffs' due process rights under the IDEA and Virginia law, by failing to render a proper decision based on an accurate and impartial understanding of the facts.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

1. Issue judgment for plaintiffs and against defendants;

2. Issue declaratory relief that defendants violated plaintiffs' rights under applicable law;

3. Issue injunctive relief, vacating the decision of the Hearing Officer and ordering defendants to reimburse plaintiffs for the tuition expenses and costs incurred in enrolling D.H. at Oakwood School 2018-19 school year;

4. Order defendants to place and fund D.H. at the Oakwood School for the 2019-20 school year and declare it to be D.H.'s current educational placement under the IDEA;

5. Order defendants to pay plaintiffs' reimbursable attorneys' fees and costs, including the fees and costs of this action; and

6. Award any other relief that this Court deems just.

Respectfully Submitted,

/s/
Paula A. Rosenstock VA Bar #65787
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740
(301) 657-3843 (fax)
Paula.Rosenstock@lawforchildren.com
Attorney for Plaintiff