**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **D.H., a minor, by his parents and next friends, K.H. and M.H.,** *et al.*,                 **Plaintiffs**         v.         **FAIRFAX COUNTY SCHOOL BOARD,**                 **Defendant.** | )  )  )  )  )  )  )  )  )  )        Criminal No. 1:19-cv-1342 |

**MEMORANDUM OPINION**

Plaintiffs, D.H. and his parents as next friends, bring this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, challenging a Hearing Officer's decision following a six-day hearing that Defendant Fairfax County School Board had provided D.H. with a Free Appropriate Public Education ("FAPE") as required by the IDEA. This matter is now before the Court on the Parties' cross motions for judgment on the administrative record.[1] Because the record establishes that Defendant provided D.H. with an Individualized Education Program ("IEP") for the 2017-18 school year that was reasonably calculated to enable D.H. to make progress in light of his circumstances, Defendant's motion for judgment on the administrative record must be granted, and Plaintiffs' motion to the contrary must be denied.

**I.**

The following findings of facts are derived from the record in this case, give due weight to the regularly made findings of the Hearing Officer following a six-day hearing, and are supported by a persuasive preponderance of the evidence.

---

[1] Although Plaintiffs style their motion as a motion for summary judgment, Defendant correctly points out that it is more accurately considered a motion for judgment on the administrative record. *See Cty. Sch. Bd. of Henrico Cty., Virginia v. Z.P. ex rel. R.P.*, 399 F.3d 298, 309 n.7 (4th Cir. 2005) ("IDEA actions are original civil actions that should typically be disposed of by motions for judgment.").

1

- At the time this action was filed, D.H. was an eleven-year-old student residing in Fairfax County, Virginia with his parents, K.H. and M.H. ("Parents" or "D.H.'s Parents"). From kindergarten—the 2013-14 school year—to fourth grade—the 2017-18 school year—D.H. attended Stratford Landing Elementary School ("Stratford Landing"), a school operated and administered by Defendant Fairfax County School Board (hereinafter referred to as "Fairfax County Public Schools" ("FCPS")).

- At the time this action was filed, D.H. was eligible for special education under the classification of Other Health Impairment, based on diagnoses of Attention Deficit Hyperactivity Disorder ("ADHD") and generalized anxiety.

- In April 2014, D.H., then in kindergarten at Stratford Landing, was considered for eligibility for special education by the FCPS Eligibility Committee due to D.H.'s Parents' concerns about D.H.'s social skills and ability to pay attention, as well as concerns raised by D.H.'s teacher concerning attention, behavior regulation, and social adjustment.

- As a result, in May 2014, D.H. underwent an array of testing and observation by FCPS staff. An FCPS school counselor observed D.H. in the classroom and noted that D.H.'s teacher often had to redirect and reassure D.H. An FCPS special education teacher also completed a test of educational achievement with D.H., who tested in the average range. In an examination by an FCPS psychologist, D.H. was found to have significant attention-related symptoms, inflexibility, sensory sensitivities, and difficulty with behavior and emotional regulation.

- On June 10, 2014, FCPS determined that D.H. was eligible for special education under the IDEA.

- D.H.'s initial IEP, put in place in 2014 for the 2014-15 school year, identified behavior improvements and social skills as areas of need.

- From December 2014 to January 2015, Parents had D.H. evaluated at the Parents' expense by Dr. David Black, a Neuropsychologist. Dr. Black administered a series of cognitive, educational achievement, and behavioral assessments.

    o In Dr. Black's cognitive assessment of D.H., Dr. Black assessed D.H. as receiving composite general conceptual ability score in the "very superior" range, combining a verbal score of "above average," a nonverbal score of "very superior," and a spatial score of "above average."

    o In Dr. Black's educational achievement assessment, D.H. performed within the "Average" range for reading and written language and within the "Above Average" range for mathematics.

    o In Dr. Black's social and emotional assessments, D.H. showed significantly elevated scores for physiological anxiety symptoms, worry, and social anxiety.

2

- - In behavior rating scales completed by Parents, Dr. Black interpreted responses to indicate a number of significant externalizing symptoms, including difficulty with attention and hyperactivity. In behavior rating scales completed by D.H.'s classroom teacher, Dr. Black found that responses did not endorse elevated scales aside from the hyperactivity scale.

- Dr. Black concluded that D.H. presented as a highly intelligent child with substantial weaknesses in attention, impulse control, and executive functioning that contributed to significant difficulties with emotion and behavior self-regulation. Dr. Black also concluded that D.H.'s test results were consistent with a diagnosis of attention deficit hyperactivity disorder ("ADHD") and unspecified anxiety disorder.

- For D.H.'s educational setting, Dr. Black recommended a classroom setting that would provide a high level of structure and support, a low student-to-teacher ratio, and regular periods of individualized and small group instruction to address weaknesses in reading and written language.

- In his interview with Dr. Black, D.H. described enjoying school, but reported having difficulty with attention and said that he often got in trouble for having trouble focusing. D.H. identified a number of friends from school and said that he enjoyed math and reading.

- At the request and expense of Parents, Dr. Black provided regular therapy for D.H. from approximately September 2015 to December 2018.

- During some of the time Dr. Black was treating D.H., D.H. was also being treated by a psychiatrist at Parent's request and expense, and the psychiatrist prescribed medication to manage D.H.'s anxiety and ADHD symptoms.

- D.H.'s end-of-year grades for the 2014-15 school year were consistently 4's and 3's on a 1 to 4 scale.[2] At the end of the school year, D.H. was reported by FCPS to be making "sufficient progress" on most IEP annual goals.[3] FCPS further reported that D.H. met one goal in utilizing coping strategies and demonstrated "some progress" on IEP goals to maintain social distance and to generate alternative approaches to dealing with frustrations.

---

[2] FCPS end-of-year report cards assess students on a four-point scale. Students who receive a 1 "seldom" demonstrate concepts and skills of the standard, while students who receive a 2 "sometimes" do so. Students who receive a 3 or 4 "usually" or "consistently," respectively, demonstrate concepts and skills of the standard. *See*, *e.g.*, Second Grade Progress Report, Administrative Record "AR" 27.

[3] In addition to periodic report card on academic progress, FCPS separately evaluates progress in IEPs. FCPS assesses progress in IEPs along a five-point scale. A progress code of "1" shows that a goal has not been introduced. A code of "2" shows that the student "has not yet demonstrated progress" toward the goal. A "3" means that the student has demonstrated "some progress" towards the goal. A "4" shows that the student "is making sufficient progress toward achieving this goal within the duration of this IEP." A "5" means that the student has achieved the goal. *See*, *e.g.*, IEP Progress Report, AR 31.

- On August 4, 2015, FCPS, in collaboration with D.H.'s Parents, revised D.H.'s IEP,[4] increasing service hours to sixteen (16) hours per week in the special education setting and half an hour per week of counseling. [5]

- By the end of the 2015-16 school year, D.H. was reported by FCPS to be making "sufficient progress" toward achieving each of his IEP goals, except in spelling, where D.H. was reported to have made "some progress." At this point, D.H. had not fully met criteria for any 2015-16 school year IEP goals. D.H.'s grades at the end of the 2015-16 school year were again consistently 4's and 3's.

- On May 10, 2016, D.H.'s IEP was again revised with the consent of, and in collaboration with, D.H.'s Parents. At this time, FCPS reported that D.H. had made great progress in no longer using his hands to touch other students. The May 2016 IEP maintained D.H.'s services at sixteen (16) hours per week, but reduced the time in the special education setting to two hours per week and reduced counseling services to half an hour per month.

- On October 18, 2016, D.H.'s IEP was again revised with the consent and collaboration of Parents to reflect D.H.'s progress, to add a reading goal to aid vocabulary acquisition, and to increase service hours to reflect D.H.'s need for greater small group support. D.H.'s primary special education hours were kept at 16 hours per week, of which the time in the special education setting was increased from two hours to six hours.

- By April 2017, FCPS reported that D.H. was making "sufficient progress" toward achieving his IEP goals for all annual goals, except for goals in Cognitive/Attention and Social Skills, where D.H. had only demonstrated "some progress." At this point, FCPS found that D.H. had not fully met the criteria for any 2016-17 IEP goals. D.H.'s grades at the end of the 2016-17 school year were again consistently 4's and 3's.

- On May 12, 2017, D.H.'s IEP team reviewed D.H.'s IEP with the collaboration and consent of Parents. The IEP team reduced D.H.'s primary special education services to ten (10) hours per week, including seven hours in the special education setting. The May 2017 IEP did not include any counseling or related services, but noted that D.H. was in a social skills group.

- FCPS completed a triennial special education reevaluation of D.H. in June 2017. FCPS determined that D.H. continued to have a disability based on diagnoses of ADHD and generalized anxiety, and that D.H. continued to need special education and related services.

---

[4] The IDEA requires IEP teams to revise the IEP "as appropriate," at least once a year, to address "lack of expected progress" among other factors. *See* 20 U.S.C. § 1414(d)(4)(A).

[5] Also known as "pull-out" services, special education services in the special education setting involve pulling the student out of the general education classroom to work one-on-one or in a small group with the special education teacher. In comparison, special education services in the general education classroom, also known as "push-in" services, generally involve a special education teacher or teaching assistant working collaboratively with the general education teacher to help a student make progress without taking them out of the classroom.

- For the 2017-18 school year, when D.H. was in fourth grade at Stratford Landing, D.H.'s IEP provided for ten (10) hours of primary special education, of which seven hours were for instruction in reading and writing in the special education setting. For the rest of the week, D.H. was in the general education setting, which was a classroom of twenty-four (24) children. A teaching assistant provided three hours per week of special education services to D.H. in the general education setting. As specified in his IEP, D.H. was provided with frequent breaks, graphic organizers, and a positive, praise-focused reinforcement system.

- In the special education setting, D.H. was in a group of nine students taught by special education teacher Agnes Kwofi and another teacher.

- D.H.'s end-of-the-year grades for the 2017-18 school year were all 4's and 3's. Although D.H. received several 2's in component areas in language arts, D.H.'s final grades in language arts were all 3's. D.H. was receiving special education in language arts and in November 2017 was reading at a beginning third grade reading level.

- As of June 2018, D.H. was reported by FCPS to have mastered two of four 2017-18 IEP goals (Reading and Writing) and to be making "sufficient progress" toward achieving the other two behavioral goals. According to special education teacher Kwofi, D.H. was "very close" to mastering his IEP behavior goals by the end of the school year.

- On the i-Ready diagnostic assessments for reading and math over the 2017-18 school year, D.H.'s scores in reading and math both went from "approaching Level 4" at the beginning of the year to "Level 4" at the end of the year.

- On a Developmental Reading Assessment administered by FCPS in February 2018, D.H. passed the Level 38 fiction passage for oral reading and comprehension. In May 2018, D.H. passed the Level 40 fiction passage, the benchmark level for fourth grade.

- In Spring 2018, D.H. passed the Virginia Standards of Learning (SOL) tests for math and Virginia studies. D.H. did not pass his SOL for reading.

- Behaviorally, D.H.'s general education teacher Dustin Hess, who saw D.H. on a daily basis, reported that at the beginning of the 2017-18 school year, D.H. lacked confidence in himself, would have "shutdowns" around once a week, and had difficulty forming friendships. But as the year progressed, general education teacher Hess, on the basis of his daily observation of D.H., noted that D.H.'s confidence and comfort in the regular education classroom improved. General education teacher Hess also reported that shutdowns decreased to around once per month, and that D.H.'s behavior was not a significant hindrance to schoolwork.

- D.H.'s mother reported that D.H. enjoyed school during the 2017-18 school year. Nonetheless, D.H.'s mother reported that D.H. was still having problems and sometimes felt traumatized at school.

5

- From September 2017 to June 2018, Dr. Black saw D.H. seventeen times for therapy. During this time period, D.H.'s parents discussed with Dr. Black the Parents' concern that D.H. was not making the progress in school that the Parents wanted D.H. to make. Dr. Black recommended a change to private school because he believed that D.H. was not succeeding in the large classroom setting.

- Around the middle of the 2017-18 school year, D.H.'s Parents began the process of applying to private schools for D.H., including Oakwood School in Annandale, Virginia ("Oakwood"). D.H. was accepted by Oakwood and in the spring of 2018 the Parents put down a deposit to reserve D.H.'s place for the 2018-19 school year.

- In late January 2018, on the recommendation of Dr. Black, D.H.'s Parents retained Educational Consultant Dr. Laura Solomon to work with them on D.H.'s educational issues. Dr. Solomon met with D.H.'s Parents, observed D.H. in the special education classroom, and participated in D.H.'s IEP meetings.

- Dr. Solomon conducted her own diagnostic educational evaluation of D.H. on April 2, 2018. In Dr. Solomon's testing, all of D.H.'s educational achievement scores fell on the "average" range, with the exception of the passage comprehension subtest, which fell in the "low average" range. D.H.'s scores in the reading test fell in the "low average" range. During the testing, Dr. Solomon reported that D.H.'s general pace of process and output were slow or extremely slow.

- Dr. Solomon also had D.H.'s mother and teachers complete behavior rating scales for D.H. special education teacher Kwofi and general education teacher Hess completed questionnaires. Dr. Solomon concluded from the responses to the behavior rating scales that D.H.'s behavior and executive functioning were significantly poorer in non-specialized environments, that is at home and in the general education classroom, than they were in the special education classroom.

- In May 2018, FCPS school psychologist Sarah Painter conducted an updated psychological evaluation of D.H. using, *inter alia*, cognitive tests and behavioral rating scales. FCPS school psychologist Painter reported that D.H.'s overall abilities appeared to fall in the "average" to "high average" range.

- With respect to behavioral functioning, FCPS school psychologist Painter, based on behavioral rating scales responses from D.H.'s mother, special education teacher Kwofi, and general education teacher Hess, as well as FCPS school psychologist Painter's own observations in the testing environment, concluded that D.H. appeared to struggle most with focusing and impulsivity. The behavioral rating scale completed by D.H.'s mother led to "clinically significant" range scores for attention problems and hyperactivity, while general education teacher Hess's ratings resulted in higher "at-risk" range scores on both scales. FCPS school psychologist Painter found D.H.'s behaviors to be consistent with D.H.'s diagnosis of ADHD.

- Beginning May 15, 2018, FCPS convened a series of meetings of D.H.'s IEP team to revise D.H.'s IEP for the 2018-19 school year. IEP team meetings were held on May 15, July 6, August 13, and August 20, 2018. D.H.'s Parents, their attorney, and Dr. Solomon participated in the IEP team meetings.

- Although D.H.'s Parents had already made a non-refundable deposit at Oakwood for the 2018-19 school year, D.H.'s mother testified at later administrative proceedings before the Hearing Officer that the Parents were open to considering whether FCPS would propose a revised IEP for D.H. that would address their concerns for D.H.'s education.

- On August 3, 2018, D.H.'s Parents notified FCPS through their attorney that D.H. would attend Oakwood for the 2018-19 school year and requested that FCPS place and fund D.H. at Oakwood. D.H.'s Parents told FCPS that they did not believe that an appropriate special education program had been identified or offered by FCPS.

- FCPS' proposed 2018-19 IEP for D.H. ("August 2018 IEP") was finalized on August 20, 2018. The August 2018 IEP provided for D.H. to receive 22.5 hours per week of primary special education services, of which ten (10) hours would be provided in the special education setting. This revision represented an increase of 12.5 hours per week of primary special education services, including three hours more per week of provision of services in the special education setting. The August 2018 IEP would have been implemented at Stratford Landing.

- The proposed IEP also provided a detailed list of supports as accommodations and modifications: (i) frequent breaks; (ii) extended time for tests, quizzes, and classroom assignments; (iii) minimal distraction in D.H.'s environment; (iv) close proximity to the point of instruction; (v) explicit directions followed by repetition of instructions by D.H.; (vi) access to fidgets; (vii) access to wobble stool; (viii) clearly defined limits and expectations; (ix) positive reinforcement system; and (x) additional attentional strategies.

- D.H.'s Parents believed that D.H. required placement at Oakwood and were not in agreement with the August 2018 IEP placement proposal. The IEP team considered the input from the Parents and Dr. Solomon, but FCPS maintained that the proposed IEP would provide the support D.H. needed to address his areas of need.

- On August 21, 2018, D.H.'s Parents executed a FCPS Student Withdrawal Form stating that D.H. was transferring to Oakwood.

- Oakwood is a small private school, grades 1 through 8, which specializes in working with children who have learning disabilities or dyslexia. The maximum class size is 10-13 students, with two teachers in every classroom.

- According to Parents and teacher reports, D.H. did well at Oakwood in the 2018-19 school year. Academically, D.H. made good progress in reading and math. D.H. was also doing well enough from a mental health standpoint that in December 2018, Dr. Black recommended ending his therapy services.

- While D.H. attended Oakwood, D.H.'s Parents reached out to Stratford Landing and requested to observe the proposed placement to see how the August 2018 IEP would be implemented. The Parents and Dr. Solomon observed a general education classroom on November 7, 2018. The class contained twenty students and one teacher during the observation.

- In Dr. Solomon's opinion, the program was inappropriate due to D.H.'s lack of executive functioning skills, his learning disabilities, struggles with attention, and his prior difficulties in the general education classroom.

- In March 2019, the Parents filed a due process hearing request appealing the August 2018 IEP.

- The due process hearing was held over a period of six days from June 6 to July 1, 2019. The Parents and FCPS were permitted to testify and to call witnesses. Counsel for the Parties conducted direct and cross examination of witnesses and introduced exhibits into evidence. D.H.'s Parents called four witnesses, and FCPS called nine witnesses. The hearing was transcribed by court reporters. At the joint request of both Parties, the Parties were permitted to file post-hearing briefs in lieu of oral argument.

- On July 30, 2019, the Hearing Officer issued a decision in favor of FCPS. In a thirty-five (35) page decision, the Hearing Officer made extensive findings of fact and drew conclusions based on explicit assessments of weight and credibility.

On October 23, 2019, D.H.'s Parents brought this action in this Court on behalf of D.H., alleging that FCPS had failed to provide D.H. with a Free Appropriate Public Education ("FAPE") as required by the IDEA. 20 U.S.C. § 1400. Plaintiffs allege that the Hearing Officer plainly erred in his decision in favor of FCPS, and request tuition reimbursement for D.H.'s placement at Oakwood for the 2018-19 school year and funding for D.H.'s placement at Oakwood for the 2019-20 school year. On May 29, 2020, Parties filed cross motions for judgment on the administrative record.

## II.

The IDEA authorizes aggrieved parties to bring an action in federal court to challenge the outcome of the state administrative proceeding. Actions under the IDEA are "independent civil actions in which the district court considers the record of the state administrative hearing, as well

as any new evidence offered by a party, and makes findings based on the preponderance of the evidence." *Z.P. ex rel. R.P.*, 399 F.3d at 304; *see also* 20 U.S.C. § 1415(i)(2).

IDEA cases are reviewed under a "modified de novo" standard, "giving 'due weight' to the underlying administrative proceedings." *R.F. by & through E.F. v. Cecil Cty. Pub. Sch.*, 919 F.3d 237, 244–45 (4th Cir.), *cert. denied*, 140 S. Ct. 156 (2019) (quoting *M.S. ex rel. Simchick v. Fairfax Cty. Sch. Bd.*, 553 F.3d 315, 323 (4th Cir. 2009)). In accordance with Fourth Circuit precedent, a Hearing Officer's regularly made findings of fact must "be considered *prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it." *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991).[6] In determining whether a Hearing Officer's findings of fact were "regularly made," the Fourth Circuit has made clear that reviewing courts should focus "on the *process* through which the findings were made." *J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008) (emphasis in original). In this respect, the Fourth Circuit has explained that "[f]actual findings are not regularly made if they are reached through a process that is far from the accepted norm of a fact-finding process." *Z.P. ex rel. R.P.*, 399 F.3d at 305 (internal quotation marks omitted).[7] Additionally, the Fourth Circuit has also made clear that the IDEA "requires great deference to the views of the school system rather than those of even the most well-meaning parent." *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 328 (4th Cir. 2004).

---

[6] If a district court disagrees with regularly made factual findings, the court must "explain how [the district court], despite the fact that [the district court] was reviewing a cold record, reached a conclusion completely contrary to that of the [Hearing Officer] who conducted the proceedings." *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 327 (4th Cir. 2004).

[7] Although the Fourth Circuit's determination of whether fact findings are regularly made centers on process, the Fourth Circuit has stated that "in a proper case, the manner in which a Hearing Officer's factual findings are presented could be so deficient as to deprive the opinion of the deference to which it would otherwise be entitled." *J.P. ex rel. Peterson*, 516 F.3d at 260. No such deficiency exists here.

These principles, applied here, clearly establish that the Hearing Officer's findings were "regularly made" and should therefore be given "due weight." *J.P. ex rel. Peterson*, 516 F.3d at 259. The Hearing Officer, in a six-day hearing, permitted D.H.'s Parents and FCPS to testify and call witnesses, and to have the opposing Party cross-examine those witnesses. Furthermore, the Hearing Officer permitted Parties to introduce exhibits into the record, and the Parties did so, submitting collectively a total of one hundred and seventy (170) exhibits into the record—seventy-five (75) from FCPS and ninety-five (95) from D.H.'s Parents. *See* Index of Record of Administrative Proceedings, AR at 1-10 The Parties were also permitted to file post-hearing briefs. Following the six-day hearing and the submission of additional briefing, the Hearing Officer published his findings and analysis in a thorough thirty-five (35) page decision. *See* Hearing Officer Decision, AR 231.

In his thirty-five (35) page decision, the Hearing Officer made explicit findings as to the credibility of witnesses and provided explanations for his decision to rely on certain witnesses over others. For example, the Hearing Officer found that the assertion by Plaintiffs' expert witness Dr. Solomon, who never observed D.H. in the general education classroom, that D.H. was in "tremendous or acute distress" in the general education setting was not persuasive because it was at odds with the first-hand accounts of D.H.'s classroom and special education teachers who worked with D.H. daily. *See* Hearing Officer Decision, AR 231, at 26, 33. The Hearing Officer likewise found the opinions of Plaintiffs' expert witness Dr. Black to be unpersuasive because Dr. Black, unlike Defendant's teacher witnesses, did not observe D.H. at Stratford Landing and did not speak with the FCPS teachers who worked with D.H. on a daily basis. *Id*. at 33. These explicit credibility determinations by the Hearing Officer were based on the Hearing Officer's synthesis of testimonial and evidentiary evidence, and clearly support the conclusion that the Hearing

Officer's findings were "regularly made" and thus entitled here to "due weight." *J.P. ex rel. Peterson*, 516 F.3d at 259.

Seeking to avoid this conclusion, Plaintiffs argue that the Hearing Officer's factual findings were not regularly made because the Hearing Officer never explained his reasons for crediting certain witness's testimony over others. A fair reading of the Hearing Officer's decision clearly refutes this contention. As stated above, the Hearing Officer's decision explicitly made and explained his credibility determinations when deciding whether to credit some witnesses over others.

Plaintiffs also contend that the Hearing Officer failed to take into account D.H.'s progress—or lack thereof—on previous IEPs. This contention is also unpersuasive and contrary to the record. The Hearing Officer made the explicit finding that D.H. made progress on his previous IEPs even if D.H. failed to master all of his goals. Significantly, the Hearing Officer concluded that D.H. made meaningful progress, both academically and behaviorally, in the 2017-18 school year. In this regard, the Hearing Officer addressed the apparent inconsistency in the responses to the questionnaire completed by general classroom teacher Hess, which appear to show D.H. struggling behaviorally and emotionally, and his testimony at the hearing, in which general education teacher Hess described D.H. as growing and improving over the year. Specifically, in behavioral questionnaires completed in spring 2018, general education teacher Hess gave responses leading to results that showed D.H. as being in "at-risk" categories for focusing and impulsivity. But importantly, at the hearing, Hess testified that D.H. had "made a lot of growth throughout the school year," and that D.H. by the end of the school year was in a better place in terms of self-confidence and comfort in the classroom. Hearing Transcript, AR 173, at 137. The Hearing Officer concluded that general education teacher Hess's responses were not inconsistent;

11

although general education teacher Hess observed D.H. to be struggling behaviorally in spring 2018, D.H. nonetheless made meaningful progress during the 2017-18 school year. *See* Hearing Officer Decision, AR 231, at 32.

In conclusion, under Fourth Circuit precedent, the Hearing Officer's findings of fact were plainly "regularly made," and are therefore entitled to "due weight," and are adopted here, as the Hearing Officer's findings are clearly supported by a preponderance of the evidence in the record as a whole. *J.P. ex rel. Peterson*, 516 F.3d at 259.

## II.

Under the IDEA, if States accept funds under the Act, States are required to comply with a number of statutory provisions. *See* 20 U.S.C. § 1400. In addition to guaranteeing procedural rights for children and parents, the IDEA requires States to guarantee the substantive right of a FAPE to all children with disabilities. *See* 20 U.S.C. § 1412(a)(1).

At the center of the IDEA's education delivery system is the IEP. A student's IEP is a document that is created through collaboration between school staff and parents that "describes the child's unique needs and the state's plan for meeting those needs." *R.F.*, 919 F.3d at 241 (citing *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 994 (2017)). Under the IDEA, IEPs must include "a statement of the child's present levels of academic achievement and functional performance, . . . a statement of measurable annual goals, . . . a description of how the child's progress toward meeting the annual goals . . . will be measured, . . ., [and] a statement of the special education and related services and supplementary aids and services . . . to be provided to the child." 20 U.S.C. § 1414(d)(1)(A)(i). The IEP team is required to revise the IEP "as appropriate," at least once a year, to address "lack of expected progress" among other factors. *Id.* § 1414(d)(4)(A).

The Supreme Court has made clear that, in order "[t]o meet its substantive obligation under the IDEA [to prove a FAPE], a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. In addition to this substantive requirement, the IDEA also requires that "each disabled student receive instruction in the 'least restrictive environment' ('LRE') possible." *AW ex rel. Wilson v. Fairfax Cty. Sch. Bd.*, 372 F.3d 674, 681 (4th Cir. 2004) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 180–82 (1982)). The Fourth Circuit has explained that the LRE requirement "reflects the IDEA's preference that "[t]o the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled." *AW ex rel. Wilson*, 372 F.3d at 681. These principles, applied to D.H.'s unique circumstances, point persuasively to the conclusion that Defendant offered an IEP for the 2018-19 school year reasonably calculated to enable D.H. to make appropriate progress.

Academically, D.H. had consistently progressed from grade to grade over the past four years, achieving 4's and 3's on his report cards on a four-point scale. D.H.'s grades comport with the cognitive assessment administered by FCPS school psychologist Sarah Painter in May 2018, which placed D.H. in the average to high average range.[8] In the 2017-18 school year, D.H. made meaningful progress academically, with the notable exception of his failure to pass the Virginia Standard of Learning ["SOL"] for Reading. However, although D.H. did not pass the Reading

---

[8] D.H.'s Parents contend that D.H. should be considered intellectually superior based on tests performed by Dr. Black in 2015. Based on that contention, Parents conclude that although D.H. made some academic progress in the 2017-18 school year, D.H. was not making progress appropriate in light of his potential. The Hearing Officer correctly concluded that the IEP team appropriately considered the results of FCPS school psychologist Painter's assessment in guiding the IEP because it was the most recent assessment. *See* Hearing Officer Opinion, AR 231, at 25. *See also* 34 CFR § 300.324(a)(iii) (the IEP team must consider the results of the "most recent evaluation of the child"). Based on FCPS school psychologist Painter's cognitive assessment and testimony, the Hearing Officer correctly concluded that D.H. made significant, meaningful academic progress in the 2017-18 school year.

13

SOL, D.H. mastered two annual goals from his May 2017 IEP in reading and writing, and made good progress generally. *See* June 2018 IEP Progress Report, AR 45.[9]

With respect to D.H.'s behavior, the record reflects that, at the time that the August 2018 IEP was developed, D.H. had dealt with difficulty paying attention, hyperactivity, and anxiety for at least four years. Previous IEPs had recognized D.H.'s disabilities, and it appears had made reasonable efforts to deal effectively with them. Although Parents' expert, Dr. Solomon, concluded from D.H.'s teachers' questionnaire answers that D.H. was in "tremendous" or "acute" distress in the general education classroom in the 2017-18 school year, this opinion was at odds with general education teacher Hess's testimony that by the end of the 2017-18 school year D.H. had made great progress. As noted above, the Hearing Officer appropriately concluded, based on the evidence and testimony at the hearing, that Dr. Solomon's assertion was not persuasive in light of general education teacher Hess's evidence to the contrary based on his first-hand, daily contact with D.H. Consistent with Hess's testimony and first-hand experience, D.H.'s June 2018 IEP Progress Report indicated that D.H. received 4's on both of his behavioral goals of attention seeking and self-regulation, meaning that he was "making sufficient progress toward achieving" the goals within the duration of the IEP. *See* June 2018 IEP Progress Report, AR 45. Although D.H. received 4's on his behavioral goals and did not master either goal, special education teacher Kwofi testified that D.H. was "very, very close" to mastering both goals. Hearing Officer Decision, AR 231, at 31. In short, when the IEP team convened to negotiate D.H.'s IEP for the 2018-19 school year, D.H. was a cognitively average to above average child who had made substantial, meaningful progress academically and behaviorally in the past year, despite continued struggles.

---

[9] D.H.'s failure to pass his reading SOL in the 2017-18 school year is concerning. Indeed, it appears that D.H.'s IEP team agreed that the failure was concerning, and accordingly crafted the August 2018 IEP to address this. Specifically, the August 2018 IEP included additional service hours and additional goals in reading and behavior, among other areas, to address D.H.'s failure to pass his reading SOL. *See* August 2018 IEP, AR 67.

D.H.'s IEP team crafted an IEP based on these circumstances that was reasonably calculated to ensure D.H. received a FAPE in the least restrictive environment possible. The IEP team convened four times to review D.H.'s status and prepare an IEP for the 2018-19 school year, which was finalized in August 2018. The August 2018 IEP established ten goals for D.H. in reading, writing, spelling, mathematics, social skills, executive functioning, and self-regulation. The August 2018 IEP also more than doubled D.H.'s service hours, increasing total service hours per week from ten (10) to twenty-two and a half (22.5). Service hours in the special education classroom were increased from seven hours per week to ten (10). The IEP called for implementation at Stratford Landing, with much of D.H.'s time spent in the general education classroom. On top of additional goals and service hours, the August 2018 IEP listed a number of accommodations for D.H., such as use of a fidget and a wobble stool. Given the evidence before the IEP team of academic and behavioral progress combined with continued struggles, the August 2018 IEP was reasonably calculated to enable D.H. to continue to make progress in light of his circumstances in the least restrictive environment possible. In other words, the August 2018 IEP met Defendant's obligations under the IDEA to provide D.H. with a FAPE.

D.H.'s Parents contend that the August 2018 IEP was insufficient to ensure that D.H. would make appropriate progress in light of his circumstances, and argue that D.H. should have been placed at Oakwood for the 2018-19 to provide D.H. with a continuous special education environment and a small class size. However, as the Supreme Court has made clear, the IDEA requires that an IEP be "reasonable," not "ideal." *Endrew F.*, 137 S. Ct. at 999. It is understandable that D.H.'s Parents would want the best for their child, but that is not what the IDEA requires. Rather, the IDEA requires that FCPS provide an IEP that gives D.H. an opportunity to make reasonable progress in light of his circumstances. FCPS did so here. Moreover, in addition to the

15

IDEA requirement that every disabled student receive a FAPE, the IDEA also requires that each disabled student receive instruction in the least restrictive environment possible. *See AW ex rel. Wilson*, 372 F.3d at 681. The preponderance of the evidence clearly supports the conclusion that FCPS met its obligations under the IDEA by providing D.H. with an IEP for the 2018-19 school year that was reasonably calculated to enable D.H. to make progress in light of his circumstances and history while enabling D.H. to continue the majority of his instruction with his non-disabled classmates.

D.H.'s Parents also understandably point to D.H.'s success at Oakwood in the 2018-19 school year as evidence that Oakwood was the appropriate implementation site for the August 2018 IEP. Again, this argument overstates the substantive requirements of the IDEA. As the Supreme Court has made clear, an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. In other words, an IEP must enable reasonable progress, not ideal progress. D.H.'s excellent progress at Oakwood should be celebrated. However, D.H.'s success at Oakwood does not alter the substantive requirement under the IDEA that school districts provide an IEP that gives the student an opportunity to make reasonable, not ideal, progress. In D.H.'s August 2018 IEP, FCPS clearly provided an opportunity for D.H. to make reasonable progress in light of D.H.'s circumstances. Accordingly, Plaintiffs' request for reimbursement for D.H.'s 2018-19 school year at Oakwood and for placement at Oakwood for the 2019-20 school year must be denied.

Accordingly, Defendant's motion for judgment on the administrative record must be granted, and Plaintiffs' motion to the contrary must be denied.

An appropriate Order will issue separately.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
January 19, 2021

/s/
T. S. Ellis, III
United States District Judge